IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:14-cr-00341-CRB |
| Plaintiff, | **ORDER GRANTING MOTIONS TO DISMISS** |
| v. | |
| YURI SIDORENKO, ALEXANDER VASSILIEV, and MAURICIO SICILIANO, | |
| Defendants. | |

In this case, the United States government urges the application of federal criminal statutes to prosecute foreign defendants for foreign acts involving a foreign governmental entity. The government has charged Defendants Yuri Sidorenko, Alexander Vassiliev, and Mauricio Siciliano with five counts: (1) Conspiracy to Commit Honest Services Wire Fraud, in violation of 18 U.S.C. § 1349; (2) Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 2, 1343; (3) Conspiracy to Solicit and to Give Bribes Involving a Federal Program, in violation of 18 U.S.C. § 371; (4) Soliciting Bribes Involving a Federal Program, in violation of 18 U.S.C. §§ 2, 666(a)(1)(B); and (5) Giving Bribes involving a Federal Program, in violation of 18 U.S.C. §§ 2, 666(a)(2). Two of the three defendants[1] move to dismiss the Indictment ("Ind."), arguing: (1) that the Indictment fails to state an offense because the wire fraud and bribery charges do not apply extraterritorially; (2) that the charges violate due

---

[1] Defendant Yuri Sidorenko has not appeared to date.

1 process because there is an insufficient domestic nexus to prosecute Defendants in the United
2 States; (3) that the wire fraud and bribery charges are defective as alleged; and (4) that
3 Defendant Siciliano enjoys immunity from prosecution by virtue of his employment with a
4 United Nations specialized agency. See generally Motions to Dismiss ("MTDs") (dkts.
5 32–33).

The Court hereby GRANTS the Motions to Dismiss based on Defendants' first two arguments, and does not reach the second two arguments.

## I.  BACKGROUND[2]

The International Civil Aviation Organization ("ICAO") is a United Nations specialized agency headquartered in Montreal, Canada. Ind. ¶¶ 1, 8. One of ICAO's responsibilities is standardizing machine-readable passports. Id. ¶ 2. The standards that ICAO established were used to determine which features would be utilized in passports in a variety of countries, including the United States. Id. From 2005–2010, the United States, a member of ICAO, made annual monetary contributions to ICAO exceeding $10,000 per year. Id. ¶¶ 1, 3. Those contributions constituted 25% of ICAO's annual budget.[3] Id.

Siciliano was an employee of ICAO and was specifically assigned to work in the Machine Readable Travel Documents Programme. Id. ¶ 8. Siciliano worked and resided in Canada, where ICAO is headquartered. Id. He held a Canadian passport but is a Venezuelan national. Id. Sidorenko and Vassiliev[4] were chairmen of a Ukranian conglomerate of companies that manufactured and supplied security and identity products, called the EDAPS Consortium ("EDAPS"). Id. ¶¶ 4, 7–8.[5] Sidorenko is a citizen of Ukraine, Switzerland, and

---

[2] The facts in this section are taken from the Indictment and accepted as true for purposes of the Motions to Dismiss. See United States v. Buckley, 689 F.2d 893, 897 (9th Cir. 1982).

[3] The Indictment does not specify how much money the United States contributed annually, but the Indictment does state that ICAO's annual budget was at least $64,699,000. Id. ¶ 3. Thus, the United States presumably contributed millions of dollars to ICAO each year. See Government's Response to MTDs ("Resp.") at 9, 14.

[4] Vassiliev is Sidorenko's nephew. Ind. ¶ 7.

[5] In the relevant time period, Sidorenko was the Chairman of EDAPS's Advisory Council and effectively controlled EDAPS, and Vassiliev was EDAPS's Chairman of the Board. Id. ¶ 7–8.

St. Kitts & Nevis, but he primarily resided in Dubai during the relevant time period. Id. ¶ 6. Vassiliev also resided in Dubai, but he is a citizen of Ukraine and St. Kitts & Nevis. Id. ¶ 7.

Sidorenko and Vassiliev provided money and other things of value to Siciliano in exchange for Siciliano using his position at ICAO, in Canada, to benefit EDAPS, in Ukraine, as well as Sidorenko and Vassiliev, in Dubai, personally. Id. ¶ 10. Siciliano, working in Canada, sought to benefit the Ukrainian conglomerate EDAPS by introducing and publicizing EDAPS to government officials and entities, by arranging for EDAPS to appear at ICAO conferences, and by endorsing EDAPS to other organizations or business contacts. Id. ¶¶ 11–12.

Siciliano assisted Vassiliev's girlfriend in obtaining a visa to travel to Canada in 2007. Id. ¶ 15. Around the same time, Siciliano also considered arranging to obtain a visa for Sidorenko by hiring Sidorenko as a consultant for ICAO. Id. ¶ 16. Additionally, the three defendants arranged to have Defendant Siciliano's son sent to Dubai to work for Sidorenko. Id. ¶ 20. During this time period, Siciliano, who worked in Canada, wrote an e-mail message to Vassiliev, residing in Dubai, seeking payment of "dues" via wire transfer to a Swiss bank account. Id. ¶ 17.

A few years later, Siciliano, still in Canada, sent an e-mail advising Vassiliev and Sidorenko, still in Dubai, that they owed him three months' payment. Id. ¶ 18. A few weeks after this email, Siciliano sent another email to Vassiliev referencing future projects, receiving "the fruits of [their] marketing agreement[,]" and inquiring about picking up his dues. Id. ¶ 19.

All of this conduct occurred outside of the United States between three defendants who are not United States citizens, who never worked in the United States, and whose use of wires did not reach or pass through the United States. See generally id.

## II.   LEGAL STANDARD

On a motion to dismiss pursuant to Federal Rule of Criminal Procedure 12(b), the allegations of the indictment must be viewed as a whole and taken as true. See Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952); Buckley, 689 F.2d at 897. The

3

indictment "shall be a plain, concise[,] and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c).  The Ninth Circuit has held that "an indictment setting forth the elements of the offense is generally sufficient." United States v. Fernandez, 388 F.3d 1199, 1220 (9th Cir. 2004); see also United States v. Woodruff, 50 F.3d 673, 676 (9th Cir. 1995) ("In the Ninth Circuit, '[t]he use of a "bare bones" information—that is one employing the statutory language alone—is quite common and entirely permissible so long as the statute sets forth fully, directly[,] and clearly all essential elements of the crime to be punished.'")  Additionally, when considering a motion to dismiss the indictment, the indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." United States v. Berger, 473 F.3d 1080, 1103 (9th Cir. 2007) (citing United States v. King, 200 F.3d 1207, 1217 (9th Cir. 1999)).  Finally, in reviewing a motion to dismiss, the Court "is bound by the four corners of the indictment." United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002).

### III.  DISCUSSION

#### A.  Extraterritorial Application of Criminal Statutes

Siciliano and Vassiliev both argue that the Indictment should be dismissed because the crimes charged do not apply extraterritorially.  See generally MTDs.  The Court agrees.

#### 1. Morrison

In Morrison v. Nat'l Australia Bank Ltd., the Court considered the extraterritorial application of Section 10(b) of the Securities Exchange Act.  561 U.S. 247, 254 (2010).  In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court held without dissent that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." Id. at 255 (emphasis added).  Although Morrison was a civil case, the Court stated that it applies "the presumption [against extraterritorial application] in all cases." Id. at 261.  Additionally, the Court held that inferences regarding what Congress might have intended are insufficient; for a court to apply a statute extraterritorially, Congress must give a "clear" and "affirmative indication" that the statute applies extraterritorially. Id. at 265; see also Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1665 (2013) (holding

4

1 that the Alien Tort Claims Act does not have extraterritorial effect because "nothing in the
2 text of the statute suggests that Congress intended causes of action recognized under it to
3 have extraterritorial reach") (emphasis added).

4 After Morrison, lower courts began to reconsider the extraterritorial application of
5 various federal statues. See, e.g., Loginovskaya v. Batratchenko, 764 F.3d 266, 271–72 (2d
6 Cir. 2014) (holding that the Commodities Exchange Act cannot be applied extraterritorially).
7 Post-Morrison, the Ninth Circuit held that "RICO does not apply extraterritorially in a civil
8 or criminal context." United States v. Chao Fan Xu, 706 F.3d 965, 974 (9th Cir. 2013). The
9 Ninth Circuit also recognized that Morrison created a "strong presumption that enactments of
10 Congress do not apply extraterritorially." Keller Found./Case Found. v. Tracy, 696 F.3d 835,
11 844 (9th Cir. 2012). However, the Ninth Circuit has yet to decide whether the bribery and
12 wire fraud statues at issue in this case have extraterritorial reach. See United States v.
13 Kazazz, 592 F. App'x 553, 554 (9th Cir. 2014) (holding, as to a defendant charged with
14 numerous counts, one of which was wire fraud, that the court need not reach the issue of
15 extraterritorial application: "Because the stipulated facts show a sufficient domestic nexus
16 with the United States for the mail-fraud and wire-fraud counts, we need not address whether
17 these statutes have extraterritorial application.").[6]

18 Relying on Morrison, Vassiliev and Siciliano argue that because the statutes, as
19 enacted, do not contain "a clear indication of an extraterritorial application[,]" the Indictment
20 fails to state an offense. See 561 U.S. 247, 254; Vassiliev MTD at 5–9.

21 Two provisions of the bribery statute are charged here. Ind. ¶¶ 34–37. The first
22 bribery provision is violated when a defendant

23 > corruptly solicits or demands for the benefit of any person, or
24 > accepts or agrees to accept, anything of value from any person,
> intending to be influenced or rewarded in connection with any

---

[6] The government points to the holding in Kazazz that "[t]he Anti-Kickback Act and 18 U.S.C. § 371 by their nature implicate the legitimate interests of the United States." See Resp. at 11; 592 Fed. App'x at 555. That holding was premised on reasoning from a case decided 37 years before Morrison that specifically stated that because the statute at issue was silent as to its application abroad, the court was "faced with finding the construction that Congress intended." Id.; United States v. Cotten, 471 F.2d 744, 750 (9th Cir. 1973) (emphasis added). This inference into Congress's intent is precisely what Morrison disallows. See 561 U.S. at 255, 257.

5

> business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

18 U.S.C. § 666(a)(1)(B). The second bribery provision is violated when a defendant

> corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2); see also Ind. ¶¶ 27–28. In neither bribery provision is there clear language indicating extraterritorial application.

The same is true of the wire fraud statute charged in this case, which provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343; see also Ind. ¶¶ 27–28. Congress did not include in the wire fraud statute any language indicating that it applies extraterritorially.[7] The wire fraud statute does mention "foreign commerce." 18 U.S.C. § 1343. But this mere mention does not overcome the presumption against extraterritoriality. In fact, Morrison addressed statutes that include the phrase "foreign commerce" and held that "even statutes that contain a broad language in their

---

[7] The government argues that courts may consult context, in addition to the language of the statute, to determine extraterritorial application, relying on language that Morrison directs at the concurrence: "Assuredly, context can be consulted as well." Resp. at 20–24; Morrison, 561 U.S. at 265. But the government fails to address Morrison's next sentence: "But whatever sources of statutory meaning one consults to give 'the most faithful reading' of the text, [ . . . ], there is no clear indication of extraterritoriality here." See id. The government also fails to provide any authority that other sources of statutory meaning, such as legislative history, provide any context demonstrating that the bribery and wire fraud statutes here apply abroad. Although the government claimed for the first time at the motion hearing that legislative history supported its position, it failed to specify any.

6

definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad." 561 U.S. at 262–63 (quoting EEOC v. Arabian Am. Oil Co. ("Aramco"), 499 U.S. 244, 248 (1991)); see also European Community v. RJR Nabisco, Inc., 764 F.3d 129 (2d Cir. 2014) (holding after Morrison, that [Section] 1343 cannot be applied extraterritorially).

Indeed, the government agreed at the motion hearing that "[t]here is nothing in the text of [either statute]" to indicate extraterritorial application. See Tr. (dkt. 47) at 8:4-5. Under Morrison, without a "clear" and "affirmative indication" of Congress's intent to have the bribery and wire fraud statutes apply extraterritorially, the presumption is that they do not. See 561 U.S. at 265.

### 2. Bowman

The government argues, however, that a 1922 Supreme Court case allows for the wire fraud and bribery statutes to apply abroad. Resp. at 4–14. In United States v. Bowman, the Court held that a statute criminalizing conspiracy to defraud a corporation in which the United States was the sole stockholder applied extraterritorially. 260 U.S. 94 (1922). While Bowman may still be good law, the government's reliance on it here is misplaced. Bowman involved United States citizens who were working for a corporation that was wholly owned by the United States. Id. at 94–95. Those facts are very different from the facts at hand, which involve foreign citizens working for foreign entities, and whose actions were "begun and committed outside" of the United States. See, e.g., Ind. ¶¶ 25, 37. Indeed, in Bowman, in addition to the three United States citizen defendants to whom the Court's holdings applied, there was a fourth defendant, a "subject of Great Britain," who had not been apprehended. 260 U.S. at 102. As to that defendant, the Bowman court held that "it will be time enough to consider what, if any, jurisdiction the District Court below has to punish him when he is brought to trial." Id. at 102–03 (emphasis added). This is hardly a ringing endorsement for the application of American criminal laws to foreign actors.

Further, the government acknowledges Bowman's holding that "frauds of all kinds" would not have extraterritorial application:

> Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and

7

> <u>frauds of all kinds</u>, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed out side of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

<u>Bowman</u>, 260 U.S. at 98 (emphasis added); Resp. at 6. However, the government points to subsequent language in <u>Bowman</u> that carves out an exception for a narrow class of criminal statutes:

> But the same rule of interpretation should not be applied to <u>criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against</u> obstruction, or <u>fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents</u>. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

<u>Bowman</u>, 260 U.S. at 98 (emphasis added); <u>see also</u> Resp. at 6. The government latches on to the phrase "not logically dependent on [its] locality for the government's jurisdiction," ignores the language about the alleged fraud having been committed "by [the United States's] own citizens, officers, or agents," and fails to point the Court to any legislative history supporting the notion that either statute was "<u>enacted</u> because of the right of the government to defend itself." <u>See</u> Resp. at 9; <u>Bowman</u>, 260 U.S. at 98 (emphasis added).

That a statute might today be a desirable tool for the government to use in defending itself does not mean that it was enacted with today's circumstances in mind. One cannot in good faith argue that the generic wire fraud statute charged here, of which the United States is not the only or inevitable victim, was "enacted because of the right of the government to defend itself against" foreign frauds. <u>See</u> <u>Bowman</u>, 260 U.S. at 98. The bribery statute charged here at least pertains to "bribery concerning programs receiving Federal Funds," which recognizes a federal interest, but its focus on agents of "an organization, or of a State,

8

1 local, or Indian tribal government, or any agency thereof" suggests that Congress's concern
2 was bribes paid to domestic government organizations. See 18 U.S.C. § 666(a). The Court
3 therefore distinguishes the opinion of the district court in United States v. Campbell, 798 F.
4 Supp. 2d 293, 303 (D.D.C. 2011), which found that Section 666 applied extraterritorially.[8]
5 The court in Campbell held that Section 666's "design was generally 'to protect the integrity
6 of the vast sums of money distributed through Federal programs from theft, fraud, and undue
7 influence by bribery.'" Id. at 304. Given that purpose, and a defendant who accepted bribes
8 while working as a contractor for a United States agency abroad, and would receive those
9 American funds, id., it is no surprise that the court found that Section 666 allowed the
10 government to reach a non-citizen.

11 The government's theory here is that because the United States funds a portion of
12 ICAO, Bowman allows it to prosecute an offense committed against ICAO using the bribery
13 and wire fraud statutes. See Resp. at 9. The cases the government cites in support of this
14 theory, including Campbell, involve United States citizens, events that occurred in or passed
15 through the United States, and/or events that directly affect the territory or agencies of the
16 United States. See, e.g., Cotten, 471 F.2d 744 (finding, where two United States citizens
17 committed crime, that it was "inconceivable that Congress, in enacting Section 641 [theft of
18 government property], would proscribe only the theft of government property located within
19 the territorial boundaries of the nation").[9] This case involves wholly foreign conduct and

---

[8] Campbell was the only case cited by the government at the motion hearing in defense of its argument on Section 666. See Tr. at 10:16–20.

[9] See also United States v. Weingarten, 632 F.3d 60, 66 (2d Cir. 2011) (holding Bowman applicable, where the defendant was a United States citizen); United States v. Leija-Sanchez, 602 F.3d 797, 798 (7th Cir. 2010) (citing Bowman where some of the criminal acts committed by the defendant occurred in the United States); United States v. Lawrence, 727 F.3d 386, 394 (5th Cir. 2013) (applying Bowman where some defendants were United States citizens and were traveling from the United States to another country); United States v. Siddiqui, 699 F.3d 690, 700–01 (2d Cir. 2012) (applying statutes extraterritorially where United States-educated defendant was convicted of attempted murder of United States nationals, attempted murder of United States officers and employees, armed assault of United States officers and employees, and assault of United States officers and employees); United States v. Belfast, 611 F.3d 783, 813–14 (11th Cir. 2010) (applying statutes extraterritorially where the defendant was a United States citizen and committed torture and other atrocities abroad); United States v. McVicker, 979 F. Supp 2d 1154, 1171 (D. Or. 2013) (applying Bowman where defendant was a United States citizen and was indicted for producing and transporting child pornography while living abroad);

9

wholly foreign actors. In addition, unlike in Campbell, there are no allegations here actually implicating the government's interest in "protect[ing] the integrity of the vast sums of money distributed through Federal programs." See id. at 304. There is no allegation that even one dollar of the millions of dollars the United States presumably sent to ICAO was squandered. Congress could not, in enacting Section 666, have envisioned that it could be applied extraterritorially to prosecute foreign crime in which the United States's investment was not harmed.

### 3. Conclusion as to Extraterritoriality

At the motion hearing, the Court asked government counsel to imagine a hypothetical in which (1) the United States sent money to Mexico for programs involving security at the border, and (2) an official in Mexico running one aspect the security program took a bribe from his brother-in-law in exchange for getting his brother-in-law's child a job. Tr. at 9:17–23. The Court asked the government whether the government could prosecute that Mexican official, and the government responded that such a prosecution would be appropriate under Section 666 (and under Section 1343 if it involved a wire). Tr. at 9:24–10:5. That assertion illustrates the government's overreach here. Of course, the United States has some interest in eradicating bribery, mismanagement, and petty thuggery the world over. But under the government's theory, there is no limit to the United States's ability to police foreign individuals, in foreign governments or in foreign organizations, on matters completely unrelated to the United States's investment, so long as the foreign governments or organizations receive at least $10,000 of federal funding. This is not sound foreign policy, it is not a wise use of scarce federal resources, and it is not, in the Court's view, the law.

Because there is no clear indication of extraterritorial intent in either statute as required by Morrison, nor does either statute fall into the narrow class of cases "enacted because of the right of the government to defend itself against . . . fraud wherever

---

Campbell, 798 F. Supp. 2d at 303 (defendant who worked for a United States agency accepted bribes while working as a contractor for the agency abroad).

10

perpetrated, especially if committed by its own citizens, officers, or agents," identified in Bowman, the Court finds that neither statute applies extraterritorially.[10]

### B. Due Process

Vassiliev and Siciliano also argue that the Indictment must be dismissed because the Due Process Clause requires a sufficient domestic nexus, and the Indictment fails to allege this. See, e.g., Vassiliev MTD at 9–11. Again, the Court agrees.

In the Ninth Circuit, "in order to apply extraterritorially a federal criminal statute to a defendant consistent with due process, there must be a sufficient nexus between the defendant and the United States so that such an application of a domestic statute to the alleged conduct would not be arbitrary or fundamentally unfair." United States v. Davis, 905 F.2d 245, 248–49 (9th Cir. 1990) (internal citation omitted). This requirement "ensures that a United States court will assert jurisdiction only over a defendant 'who should reasonably anticipate being haled into court' in this country." United States v. Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting World-Wide Volkwagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Vassiliev and Siciliano argue that the only nexus between them and the United States is that the United States partially funds ICAO, the United Nations agency for which Siciliano (but neither Vassiliev nor Sidorenko) worked. See Vassiliev MTD at 10. Both defendants characterize this link as tenuous. See Vassiliev MTD at 10. The government makes two notable counterarguments. See Resp. at 14–15.[11]

---

[10] The substantive bribery and wire fraud charges only account for three of the five counts charged in the Indictment; however, the other two counts are conspiracy to commit these crimes. Thus, it follows that conspiracy to commit these same crimes cannot apply extraterritorially either.

[11] A third is so weak as to defy understanding. The government cites Davis, 905 F.2d at 248–49, in which, according to the government, the Ninth Circuit "concluded that prosecuting the defendant for violating the Maritime Drug Law Enforcement Act based on his extraterritorial conduct did not violate due process because his conduct—attempting to smuggle contraband into United States territory—would have caused criminal acts within the United States." Resp. at 14. Of course, here, none of the criminal acts touched the United States, or would have logically "caused criminal acts within the United States." There is no nexus as there was in Davis.

11

First, the government contends that it does not violate due process "in instances in which charged conduct involve[s] non-U.S. citizens and occurred entirely abroad[,]" because a "'jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States.'" Resp. at 14 (citing United States v. Mostafa, 965 F. Supp.2d 451, 458 (S.D.N.Y. 2013)). The government subsequently cites various cases from other circuits upholding jurisdiction where defendants had the intent to cause harm inside the United States. Id. at 14–15 (citing, e.g., United States v. Al Kassar, 660 F.3d 108 (2d Cir. 2011); United States v. Brehm, 691 F.3d 547, 552–53 (4th Cir. 2012)). Even accepting this argument, no aim to harm the United States is alleged anywhere in this Indictment. There is nothing in the Indictment to support the proposition that any of the Defendants knew that the conduct alleged even involved the United States. This case is therefore fundamentally different from one involving the prosecution of terrorists who plotted outside of the United States to bomb American airplanes in Asia, see United States v. Yousef, 327 F.3d 56, 112 (2d Cir. 2003), and the government's belief that the cases are analogous, see Resp. at 15, is troubling.

Second, the government contends that the domestic nexus is satisfied by the United States's financial interest, because it pays millions of dollars annually to ICAO, and by the United States's security interest, because ICAO's work involves travel and identity documents. See id. at 14. The government cites to literally zero authority in support of this contention. Moreover, as with the government's position about the extraterritorial reach of the relevant statutes, its argument that any financial or security interest supports a domestic nexus proves too much. If everything that had an impact on national security gave the United States the right to drag foreign individuals into court in this country, the minimum contacts requirement would be meaningless. Our financial contributions to a foreign organization which does work involving travel and identity documents, and which employs (or employed) someone who illicitly arranged to have his son sent to Dubai, do not "present[] the sort of threat to our nation's ability to function that merits application of the protective principle of jurisdiction." See United States v. Peterson, 812 F.2d 486, 494 (9th Cir. 1987). Moreover, the money that the United States sent to ICAO probably increases the contacts

12

that the United States has with ICAO, but it is difficult to see how it results in adequate contacts with Siciliano, who neither lived in, worked in, nor directed any of his alleged conduct at the United States, let alone Sidorenko or Vassiliev, who did not even work for ICAO. The government also nowhere explains how much money the United States must send to a foreign employer (or the foreign employer of an individual one is bribing) to satisfy the minimum contacts requirement as to a foreign employee (or the individuals bribing him). In the hypothetical the Court gave the government at the motion hearing, the United States certainly has a financial interest in the money it sends to Mexico, and a security interest in the border. But it would be both arbitrary and fundamentally unfair to assert jurisdiction over the corrupt Mexican official or his brother-in-law, who would never reasonably anticipate being "'haled into court' in this country." See Klimavicius-Viloria, 144 F.3d at 1257.

Because there is an insufficient domestic nexus between the Defendants and the United States, the relevant statutes cannot be applied consistent with due process.

**IV.  CONCLUSION**

For the foregoing reasons, the Indictment is DISMISSED.

**IT IS SO ORDERED.**

Dated: April 21, 2015

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2014\341\order granting MTDs.wpd        13